IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        No.  07-10034-01, 02, 03, 04-WEB
                                         )
ACE A. ALDERSHOF,                        )
JOSEPH M. FLOYD,                         )
ANTHONY L. JORDAN, and                   )
ZACHARY W. FLEETWOOD,                    )
                                         )
                    Defendants.          )
_____ )

**Memorandum and Order**

This matter came before the court on August 27, 2007, for a *"James* hearing" to

determine the admissibility of alleged co-conspirator statements under Fed.R.Evid. 801(d)(2)(E).

The court took the motion under advisement at the conclusion of the hearing.  For the reasons set

forth in this order, the motion will be denied insofar as it seeks an order *in limine* prohibiting the

Government from using such statements at trial.

        I.  Legal Standards.

        The standards governing co-conspirator statements are fairly well-established.

Co-conspirator statements may properly be admitted if the court finds that (1) a conspiracy

existed; (2) both the declarant and the defendant against whom the declaration is offered were

members of the conspiracy; and (3) the statements were made in the course of and in furtherance

of the conspiracy.   *United States v. Ramirez*, 479 F.3d 1229, 1248, n.11 (10th Cir. 2007).  The

party offering the evidence must prove these facts by a preponderance of the evidence. *Bourjaily*

*v. United States*, 483 U.S. 171, 176 (1987).  Such evidence may include the statements

themselves, but the statements alone are not sufficient to establish that a conspiracy existed and

that the declarant and the defendants were members of it.  *Id.*; Fed.R.Evid. 801(d)(2)(E).

In deciding whether the Government has satisfied its burden, the court has discretion to consider any evidence not subject to a privilege, including both the challenged co-conspirator statements and any hearsay evidence, whether or not that evidence would be admissible at trial. *See United States v. Owens*, 70 F.3d 1118 (10th Cir. 1995) (at the James hearing, the court could hear testimony from the agent summarizing statements made by co-conspirators to the agent). *See also* Fed.R.Evid. 104(a)(preliminary questions concerning the admissibility of evidence shall be determined by the court; in making its determination the court is not bound by the rules of evidence).

II.  Summary of Evidence.

The Government presented testimony at the *James* hearing from Wichita Police Detective Kevin Real.  Real was involved in the investigation of the case and he reviewed grand jury transcripts and other reports in preparation for the hearing.  Real testified from these sources about evidence of numerous statements allegedly made by one or more of the defendants. According to the Government, evidence of such statements may be presented at trial from several witnesses, including Molly Korth, Jamie Wright, and defendant Ace Aldershof.

The Government presented evidence that arrangements were made for a "reverse" sale of methamphetamine by a cooperating individual ("CI"), James Everett, to Ace Aldershof.  The plan was for the CI to sell a pound of methamphetamine to Aldershof on February 2, 2007. Police set up video, audio, and visual surveillance in anticipation of the deal, which was to take place around 7:00 p.m. at an Arby's fast food restaurant parking lot near Pawnee and Seneca streets in Wichita.  Aldershof showed up at the proposed sale and was seen by police getting into

the CI's vehicle, a white GMC pickup truck, at around 7:45.  Shortly thereafter, two men

approached the truck and ordered the CI and Aldershof out.  The two men then drove off in the

CI's vehicle.  Aldershof took off running at that point, but officers arrested him at the parking

lot, together with defendant Zachary Fleetwood.  Aldershof had $6,500 in cash with him at the

time of his arrest.

      According to Detective Real, Aldershof made a statement following his arrest.[1]  In his

statement, Aldershof allegedly said that Anthony Jordan owed him a $30,000 debt for "ice"

[methamphetamine] supplied by Aldershof in the past, so Aldershof and Jordan set up the rip-off

of the CI to allow Jordan to pay his debt.  According to Aldershof, the plan was for Jordan to

come up on the CI's vehicle while Aldershof was in it.  Aldershof said he did not have a valid

driver's license, so he had asked Zachary Fleetwood, whom he had met through another

individual involved in methamphetamine, to drive him around, including to the buy.  Aldershof

said he had supplied Fleetwood with methamphetamine in the past and that Fleetwood had

driven him around several times with dope in the car.  Aldershof said he had told Fleetwood he

needed to "pick something up" on this occasion, and that Fleetwood knew it was a

methamphetamine deal.  Aldershof said he was on his cell phone with Jordan just before the

robbery, with the cell phone on "speaker," as they discussed how Jordan would come up on the

CI's vehicle.  Aldershof said he told Jordan he did not want to show up for the buy, but that

Jordan said he had to do it in order to make the robbery look genuine to the CI, whom Jordan

knew.   Aldershof also stated that Jordan had informed him before the robbery that the CI had

---

     [1] As noted above, the Government has indicated that Aldershof will likely be a witness at
the trial.

been talking to individuals in a Camry and a Jeep Cherokee before Aldershof arrived at the Arby's.  According to Detective Real, a recording of the conversation between Aldershof and the CI in the vehicle discloses that Aldershof asked the CI about who he had met with before Aldershof's arrival, and he mentioned the fact that he had a licensed driver drive him to the meeting.  Real also testified that a check of Aldershof's and Jordan's phone records showed there were several calls between them, including a five-minute call immediately before the robbery of the CI.

Zachary Fleetwood was also interviewed after his arrest.  Fleetwood allegedly admitted to using methamphetamine in the past, and the police determined that he was likely a methamphetamine addict.

Real testified that after obtaining information identifying the robbers as Anthony Jordan and Joseph Floyd, and receiving information as to Floyd's whereabouts, officers went to the residence of an individual named Molly Korth.  They obtained Korth's consent to search the house and found defendant Floyd therein and arrested him.

Detective Real summarized the grand jury testimony of Molly Korth, who allegedly testified that on the day of the robbery she received a phone call from Zachary Fleetwood asking her to pick up a friend of his – a dancer named Mia – and drop her off at a club called "Pleasures."  According to Korth's testimony, Fleetwood told her to pick the girl up at a residence behind the shopping center at Pawnee and Seneca.  Detective Real testified that a subsequent check of phone records showed there was a call between Korth and Fleetwood at around 7:00 p.m. that evening.  Korth further testified that she received a subsequent call from Anthony Jordan changing the plan, asking her instead to bring Joseph Floyd to the McDonald's

parking lot across from the Arby's near Pawnee and Seneca.  At the time of this call, Korth was at a friend's residence with Floyd and one or more other individuals.  Korth testified that she took Floyd to the McDonald's as requested, along with the other individual, where Anthony Jordan appeared from another vehicle and got into Korth's car.  Jordan was on the phone with someone and proceeded to give Korth directions.  He told her to drive around to the back of the Arby's restaurant, where Jordan got out and said to Floyd, "Come on, Joe."  Floyd likewise got out of the car.  Korth testified that she drove to a nearby Pizza Hut, where she had dropped off the other individual, when she heard a "bang" and saw a white pickup truck driving off with Jordan and Floyd in the vehicle.

According to Detective Real, Korth testified that later that night, Jordan and Floyd showed up at her residence with the white pickup truck.  Korth became upset and insisted that Jordan remove the truck, which he and Floyd did.  She believed they parked it a few blocks away, because they showed up a short time later at her back door.  The individuals allegedly present at the residence were Korth, her roommate Jamie Wright, Jordan, Floyd, and a person known as "Havoc."  According to Korth's testimony, Jordan produced a zip-lock bag of "ice" from his pocket at the residence and stated that it was a pound.  He allegedly stated that he would be able to make a few thousand dollars off of it.  Jordan and Floyd also had what appeared to be a cooler with wires sticking out of it.  Jordan and/or Floyd allegedly stated that they had seen a red light in the pickup truck and had followed the wires to the cooler.  They talked about how the device worked.  Detective Real testified that the "cooler" was a police recording unit that had been placed in the CI's pickup truck.  Jordan also allegedly said they needed to get rid of the evidence, and talked to Floyd and Havoc about burning the pickup truck.  Detective Real

5

testified that the CI's burned-out pickup truck was later found a few miles away from Korth's residence.  Jordan, Floyd, and Havoc all left the residence, but Floyd returned sometime later and spent most of the next two days there, according to Korth's testimony.  Korth said she saw Floyd with a golf-ball size amount of methamphetamine, which Floyd said he had gotten from Jordan.  He also allegedly said he would try to get more from Jordan.

According to Detective Real, Korth's roommate Jamie Wright testified to the grand jury that she was also at the residence on the night of February 2, and saw Floyd and Jordan with the box with cords coming out of it, as well as Jordan holding the bag of "ice."  She also stated that she heard Jordan saying they had taken the white truck.  Wright would also allegedly testify that sometime later she heard Floyd on the phone trying to sell methamphetamine.

III.  Findings.

After reviewing the evidence, the court finds that the Government's *James* hearing evidence shows by a preponderance that a conspiracy existed as alleged in Count 1 of the Superseding Indictment, and that the conspiracy included the defendants Ace Aldershof, Joseph Floyd, Anthony Jordan, and Zachary Fleetwood.

To prove conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent.  *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

The evidence proffered by the Government is sufficient to show by a preponderance of evidence that Aldershof and Jordan agreed upon a plan to obtain the methamphetamine from the

CI and distribute it.  Of course, Aldershof's statement after being arrested includes an express

confession of the existence of such a conspiracy, and assuming Aldershof testifies at trial as

represented there would be no *Bruton* problem to prevent a jury from considering the full extent

of that statement.[2]  But leaving aside Aldershof's statement, there is substantial independent

evidence of the conspiracy, including the records of several calls between Aldershof and Jordan,

including a five-minute call immediately before the robbery, and the reasonable inference that

Jordan was tipped off by Aldershof about the proposed methamphetamine sale.  Those

circumstances alone give rise to an inference that the two were "in cahoots," even absent any

evidence of an express agreement.  *See e.g. United States v. Munoz-Franco*, 487 F.3d 25, 45 (1st

Cir. 2007) (proof of formal agreement is not required to show conspiracy; agreement may be

shown by concerted action).  There is also independent evidence that Fleetwood, who was

present at the scene of the buy with Aldershof, made a call before the robbery to Molly Korth.

Korth was at that time associating with Joseph Floyd, whom the evidence suggests was one of

the individuals who robbed the CI.  Korth would allegedly testify that Fleetwood asked her to

pick up a friend of his in the area of Pawnee and Seneca, which would have placed her in the

immediate vicinity of the robbery at about the same time it was to occur.  She further would say

that Jordan, whom she also knew, subsequently called and changed the plan and asked her to

_____

[2] Aldershof's statement to the police after his arrest would not qualify under Rule 801(d)(2)(E), because it was not made in furtherance of the conspiracy.  Assuming Aldershof testifies at trial, however, he could testify directly concerning the matters discussed in his statement, and he would be subject to cross-examination insofar as his statements incriminated the other defendants.  *See e.g., United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871 (10th Cir.1989) (direct testimony of a conspirator describing his participation in the conspiracy and the actions of others is not hearsay).

drive Floyd to a McDonald's at Pawnee and Seneca.  All of this is simply too convenient to be coincidental; it reasonably implies that Aldershof, Fleetwood, Jordan and Floyd were working on a plan to converge at the time of the robbery, and together with the other evidence it reasonably implies that these four individuals came to an agreement, whether express or implied, to take the methamphetamine from the CI without paying for it.  It is a reasonable inference as well that the defendants understood that the methamphetamine would be for distribution, given the circumstances, including the large quantity involved.

As the discussion above indicates, the Government has cited evidence sufficient to show that each of the defendants knowingly and voluntarily joined in the conspiracy.  In so finding, the court notes there is evidence independent of any co-conspirator statements as to each of the defendants.  For example, as to Aldershof, there is evidence that he communicated with Jordan just before the robbery and that he showed up at the meeting arranged by the CI with a large amount of cash.  Aldershof also made admissions against interest after being arrested (Fed.R.Evid. 801(d)(2)(A)) confirming that he had made arrangements to buy methamphetamine from the CI.[3]  As to defendant Fleetwood, there is independent evidence that he admitted being a user of methamphetamine, that he was present at the scene of the buy with Aldershof, and that shortly before the robbery he had telephoned Molly Korth, who was with Joseph Floyd that day and who transported Floyd and Jordan to the scene of the robbery.  Fleetwood is thus

---

[3] Even assuming that Aldershof would not be a witness at trial and his statement would have to be redacted to comply with *Bruton*, the foregoing portion of his statement would be admissible against him to the extent it merely admitted his own agreement to purchase methamphetamine from the CI.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (confession that does not incriminate co-defendant on its face, but does so only when linked with other evidence at trial, did not violate *Bruton*).

independently, albeit indirectly, connected to the robbery.  And as far as defendants Jordan and Floyd are concerned, there is the evidence that Jordan communicated with Aldershof just prior to the robbery, as well as Korth's testimony that she transported Jordan and Floyd to the scene of the robbery, that she saw them fleeing the scene in the CI's truck, and that she later saw them with the truck and the methamphetamine.  There is also testimony from Jamie Wright that she saw Jordan and Floyd with the recording unit from the CI's truck and Jordan with the bag of methamphetamine.  When the foregoing is considered together with evidence of co-conspirator statements by Jordan and Floyd (including statements discussing selling the methamphetamine and getting rid of the truck), the evidence that these four individuals agreed upon a plan to possess methamphetamine with the intent to distribute is strong.  It shows by a preponderance that these individuals knowingly and voluntarily became a part of the plan and that they knew at least the essential objectives of the conspiracy.  The court notes defendant Fleetwood's argument that no showing had been made of his knowledge, but the court finds the reasonable inferences from the evidence are sufficient to show that he likely shared in knowledge of the essential objectives.  Those inferences suggest that Fleetwood knew this was a deal to obtain methamphetamine, that he was present with Aldershof as Aldershof communicated with Jordan just before the robbery, and that he was likely aware of the arrangement for Jordan to obtain the methamphetamine from the CI.  *Cf. United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (to prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy, but only that he "shared a common purpose or design with his alleged coconspirators.").  Moreover, the evidence establishes that the actions of each of the defendants assisted each other in carrying out

9

the objectives of the conspiracy, whether it was Aldershof arranging the purchase from the CI,

Fleetwood driving Aldershof to the scene and contacting Korth to make arrangements for her to

be near, or Jordan and Floyd taking the methamphetamine and making plans to sell it.  *See*

*United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996) (defendant's activities are

interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the

venture as a whole).   Based on all of the foregoing, the court finds the government has

established by a preponderance of evidence the first two requirements for admission of co-

conspirator statements.

    The third and final requirement under Rule 801(d)(2)(E) is that the statements must have

been made in the course of and in furtherance of the conspiracy.   *Ramirez*, 479 F.3d at 1248,

n.11.  A statement is made "during the course of the conspiracy" if it is made before the

objectives of the conspiracy have either failed or been achieved.  *United States v. Perez*, 989

F.2d 1574, 1579 (10th Cir.1993).  Statements by a conspirator are "in furtherance of the

conspiracy" when they are intended to promote the conspiratorial objectives.  *United States v.*

*Reyes*, 798 F.2d 380, 384 (10th Cir.1986).  Based on the evidence presented, the Government has

shown that at least the following statements would qualify as non-hearsay under the rule:

statements by defendant Jordan to Aldershof encouraging him to show up for the meeting with

the CI and informing him that the CI had been talking to other people before the meeting[4];

statements by Aldershof to the CI asking about the people he met with and statements that he

used a licensed driver to come to the meeting;  statements by defendant Fleetwood asking Korth

---

    [4] Such statements would be admissible under Rule 801(d)(2)(E) assuming Aldershof is a
witness at the trial.

to pick up a friend of his in the vicinity of the robbery; statements by defendant Jordan asking Korth to bring Floyd to the McDonald's;  statements by Jordan in the car with Korth including telling Korth where to go and saying to Floyd, "Come on, Joe," as he got out of the car; statements by Jordan at Korth's residence that he had a pound of methamphetamine and could make a couple of thousand dollars off of it; statements by Jordan and Floyd explaining how they took the truck, how they found the police recording unit, and trying to figure out how the unit worked; statements by Jordan that they needed to get rid of the evidence and discussions among Jordan and Floyd about burning the CI's truck; statements by Floyd at the Korth residence that he had received methamphetamine from Jordan and would try to get more, that only a couple of people knew where the meth was, and his statements on the phone trying to sell the methamphetamine.  *See United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (statements in furtherance of a conspiracy include those that explain events of importance to the conspiracy in order to facilitate its operation; statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy; and statements of a coconspirator identifying a fellow coconspirator).[5]

---

[5] As the Government pointed out at the hearing, some of the foregoing statements may be admissible under other rules as well.  For example, alleged statements by Floyd on the phone trying to sell methamphetamine would likely be admissible against him under Rule 801(d)(2)(A), and no *Bruton* problem would arise since the statement on its face does not incriminate the other defendants.  Other statements would not qualify as hearsay even if Rule 802(d)(2)(E) did not apply, such as statements by Jordan telling Korth to bring Floyd to the location or telling her where to drive.  Such directives (e.g., "bring Joe" or "turn here") do not involve assertions of fact that are true or false, and thus do not constitute hearsay.  *See United States v. Thomas*, 451 F.3d 543, (8th Cir. 2006) (Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay).

The court notes that counsel for one or more of the defendants objected at the *James* hearing to the use of such statements at trial because there was no showing of reliability of the statements, and because the declarant of the statements would be unavailable for cross-examination. Such arguments are unavailing. *Bourjaily v. United States* held that a court need not independently inquire into the reliability of statements of co-conspirators where Rule 801(d)(2)(E) applies, and nothing in the Supreme Court's *Crawford v. Washington* opinion overruled that holding. *See United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007). Thus, evidence which is admissible under the conspiracy exception to the hearsay rule does not violate the defendant's right to confront and cross-examine the witnesses against him guaranteed by the Sixth Amendment. *Id.*

IV.  Conclusion.

Defendant Fleetwood's Motion for *James* Hearing (Doc. 53) is GRANTED insofar as it requests a hearing on the admissibility of co-conspirator statements, but DENIED insofar as it seeks a pre-trial order *in limine* excluding such statements. Upon an appropriate motion, the court will reconsider the admissibility of such evidence at the conclusion of trial in light of the actual evidence presented. *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979).

Based upon the Government's representation that it has now made the disclosures for its witnesses required by *Brady* and *Giglio*, the court will deny defendant Fleetwood's Motion for Discovery of Impeachment Materials (Doc. 55) as moot.

IT IS SO ORDERED this ___31st___ Day of August, 2007, at Wichita, Ks.

s/Wesley E. Brown_____
Wesley E. Brown
U.S. Senior District Judge

12